UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MIKE SOWERS,

        Plaintiff,                                  Hon. Richard Alan Enslen

v.                                                Case No. 1:04-CV-575

COMMISSIONER OF SOCIAL
SECURITY,

        Defendant.
_____/

**REPORT AND RECOMMENDATION**

        This is an action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), to review a final decision of the Commissioner of Social Security denying Plaintiff's claim for Supplemental Security Income (SSI) and Disability Insurance Benefits (DIB) under Titles II and XVI of the Social Security Act. Section 405(g) limits the Court to a review of the administrative record, and provides that if the Commissioner's decision is supported by substantial evidence, it shall be conclusive.

        The Commissioner determined that Plaintiff is not disabled as defined by the Act. Pursuant to 28 U.S.C. § 636(b)(1)(B), authorizing United States Magistrate Judges to submit proposed findings of fact and recommendations for disposition of social security appeals, the undersigned recommends that the Commissioner's decision be **affirmed**.

**STANDARD OF REVIEW**

The Court's jurisdiction is confined to a review of the Commissioner's decision and of the record made in the administrative hearing process. *See Willbanks v. Sec'y of Health and Human Services*, 847 F.2d 301, 303 (6th Cir. 1988). The scope of judicial review in a social security case is limited to determining whether the Commissioner applied the proper legal standards in making her decision and whether there exists in the record substantial evidence supporting that decision. *See Brainard v. Sec'y of Health and Human Services*, 889 F.2d 679, 681 (6th Cir. 1989).

The Court may not conduct a de novo review of the case, resolve evidentiary conflicts, or decide questions of credibility. *See Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). It is the Commissioner who is charged with finding the facts relevant to an application for disability benefits, and her findings are conclusive provided they are supported by substantial evidence. *See* 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla, but less than a preponderance. *See Cohen v. Sec'y of Dep't of Health and Human Services*, 964 F.2d 524, 528 (6th Cir. 1992) (citations omitted). It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993). In determining the substantiality of the evidence, the Court must consider the evidence on the record as a whole and take into account whatever in the record fairly detracts from its weight. *See Richardson v. Sec'y of Health and Human Services*, 735 F.2d 962, 963 (6th Cir. 1984).

As has been widely recognized, the substantial evidence standard presupposes the existence of a zone within which the decision maker can properly rule either way, without judicial interference. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citation omitted). This

standard affords to the administrative decision maker considerable latitude, and indicates that a decision supported by substantial evidence will not be reversed simply because the evidence would have supported a contrary decision. *See Bogle*, 998 F.2d at 347; *Mullen*, 800 F.2d at 545.

## PROCEDURAL POSTURE

Plaintiff was 41 years of age at the time of the ALJ's decision. (Tr. 17). He possesses a tenth-grade education and worked previously as an assembler, cook, and busboy. (Tr. 17, 73-76).

Plaintiff applied for benefits on May 2, 2002, alleging that he had been disabled since October 15, 2001, due to seizures.[1] (Tr. 48-50, 64, 432-35). Plaintiff's application was denied, after which time he requested a hearing before an Administrative Law Judge (ALJ). (Tr. 34-47, 436-51). On January 13, 2004, Plaintiff appeared before ALJ Earl Witten, with testimony being offered by Plaintiff and vocational expert, Donald Hecker. (Tr. 453-80). In a written decision dated April 30, 2004, the ALJ determined that Plaintiff was not disabled. (Tr. 16-29). The Appeals Council declined to review the ALJ's determination, rendering it the Commissioner's final decision in the matter. (Tr. 6-9). Plaintiff subsequently initiated this appeal pursuant to 42 U.S.C. § 405(g), seeking judicial review of the ALJ's decision.

## MEDICAL HISTORY

On March 5, 2001, Plaintiff reported to the emergency room complaining of chest pain. (Tr. 242). The results of an examination were unremarkable. *Id.* X-rays of Plaintiff's chest

---

[1] Plaintiff had unsuccessfully applied for benefits on six previous occasions between 1988-1997. (Tr. 16). It appears that each application was denied administratively, after which Plaintiff pursued the matter no further.

revealed "no evidence of a focal infiltrate or mass." (Tr. 249). His heart was "normal in size and configuration" and there was "no pleural based abnormality." *Id.* Plaintiff was diagnosed with pleurisy[2] and discharged home. (Tr. 243).

On September 7, 2001, Plaintiff reported to the emergency room complaining of chest pain and shortness of breath. (Tr. 121). The results of a physical examination were unremarkable. (Tr. 121). X-rays of Plaintiff's chest were "negative." (Tr. 136). Specifically, this examination revealed that Plaintiff's "heart [was] normal in size and shape and the visualized osseous structures, soft tissues, and mediastinum are essentially unremarkable." *Id.*

On September 10, 2001, Plaintiff reported to the emergency room complaining of shortness of breath. (Tr. 223). Plaintiff was "mildly" dyspneic and an EKG revealed sinus bradycardia, but an examination was otherwise unremarkable. *Id.* X-rays of Plaintiff's chest were "normal." (Tr. 228).

On January 29, 2002, Plaintiff reported to the emergency room complaining of chest pain. (Tr. 368). The results of a physical examination were unremarkable and x-rays of Plaintiff's chest were normal with no evidence of pneumothorax, pulmonary infiltrate, or pleural effusion. (Tr. 367, 371).

On January 31, 2002, Plaintiff participated in an exercise stress test. (Tr. 365-66). During the examination, Plaintiff exhibited "no cardiac arrhythmias and no cardiac symptomatology" and the results of the examination revealed no evidence of "fixed or reversible ischemia." *Id.*

---

[2] Pleurisy refers to inflammation of the pleura or membrane which covers the inner aspect of the chest walls as well as the lungs. J.E. Schmidt, *Schmidt's Attorneys' Dictionary of Medicine* P-223 (Matthew Bender) (1996).

4

On April 21, 2002, Plaintiff reported to the emergency room complaining of dizziness. (Tr. 207). The results of a physical examination were unremarkable. Laboratory testing suggested that Plaintiff's symptoms may have been related to his use of Tegretol, which he recently resumed. Plaintiff was instructed to decrease his Tegretol dosage and discharged home. *Id.*

On May 2, 2002, Plaintiff participated in an initial polysomnography examination, the results of which revealed that Plaintiff was experiencing obstructive sleep apnea syndrome. (Tr. 165-68). Plaintiff was instructed to participate in a follow-up examination to determine whether treatment with a nasal continuous positive airway pressure (CPAP) device would help. (Tr. 165).

On May 13, 2002, Plaintiff completed a report describing his activities. (Tr. 81-84). Plaintiff reported that his wife prepares his meals, but that he shops, performs household repairs, cares for his personal needs, and watches television. (Tr. 81-83). Plaintiff also reported that he goes fishing 3-4 times each week. (Tr. 83).

The same day, Plaintiff's wife completed a similar report. (Tr. 85-90). She reported that on a typical day, Plaintiff "does some housework," takes a nap, and then goes fishing. (Tr. 85). She also reported that Plaintiff drives, performs yard work, plays cards, visits relatives, and goes out to eat. (Tr. 87-88).

On May 23, 2002, Plaintiff was taken to the emergency room following a reported seizure. (Tr. 194). Plaintiff reported that two days previously he "had a similar episode which was starting to come on. . .but they gave him some Tegretol really quick and it stopped it from coming." The results of an examination were unremarkable and Plaintiff "declined to stay in the Emergency Department, stating that he was feeling much improved." *Id.*

On June 13, 2002, Dr. Arnel Larcia, one of Plaintiff's treating physicians, completed a report regarding Plaintiff's ability to perform work-related activities. (Tr. 274-75). Dr. Larcia reported that Plaintiff suffered from seizures, sleep apnea, and COPD. (Tr. 274). The doctor reported that Plaintiff "might have seizures at work," but further noted that Plaintiff's last seizure occurred the previous year. (Tr. 274-75). As for Plaintiff's physical capabilities, the doctor reported that Plaintiff could frequently lift up to 20 pounds, occasionally lift up to 50 pounds, and could use his upper and lower extremities to perform repetitive actions. (Tr. 275). The doctor did not report how long Plaintiff was able to sit, stand, and/or walk during an 8-hour workday. *Id.*

On July 1, 2002, Plaintiff participated in a second sleep study, during which he utilized a CPAP device. (Tr. 169-77). The doctor concluded that use of the CPAP device did not improve Plaintiff's sleep apnea and, therefore, recommended to Plaintiff that he consider surgical intervention. (Tr. 177).

X-rays of Plaintiff's chest, taken July 10, 2002, revealed "the suggestion of a patchy infiltrate at the left base posteriorly which is not shown on prior studies." (Tr. 273). This examination also revealed that "the pulmonary parenchyma is otherwise unchanged" and "there is no pneumothorax, pleural effusion or congestive heart failure." *Id.*

On September 19, 2002, Plaintiff participated in a pulmonary function test, the results of which revealed "severe obstructive airways disease with air trapping and minimal reduction in diffusion capacity." (Tr. 418).

On April 11, 2003, Plaintiff reported to the emergency room complaining of "mild" breathing difficulty. (Tr. 343-44). The results of a physical examination were unremarkable and x-

rays of Plaintiff's chest were "normal." (Tr. 344, 350). Plaintiff was treated with a nebulizer and discharged home in stable condition. (Tr. 344).

On April 23, 2003, Plaintiff reported to the emergency complaining of "increased seizures." (Tr. 334-35). Plaintiff reported that he suffered a seizure the previous night, as well as another seizure earlier that day. (Tr. 334). The results of an examination were unremarkable. (Tr. 334-35). Plaintiff was given medication and discharged home. (Tr. 335).

On May 5, 2003, Plaintiff participated in a pulmonary function evaluation, the results of which revealed "mild to moderate obstructive ventilatory impairment with significant improvement after inhalation of bronchodilator therapy." (Tr. 325).

On May 7, 2003, Plaintiff participated in a polysomnographic sleep study, the results of which revealed that he was experiencing "moderate obstructive sleep apnea with moderate sleep fragmentation and mild oxygen desaturation." (Tr. 373).

On May 9, 2003, Plaintiff reported to the emergency room following an alleged seizure. (Tr. 327-28). The results of an examination were unremarkable and Plaintiff's Tegretol level was normal. *Id.* Plaintiff was discharged home in stable condition "with instructions to take the medication regularly." (Tr. 328).

On May 20, 2003, Plaintiff reported to the emergency room complaining of "shortness of breath and cough for an unknown period of time." (Tr. 315). Plaintiff denied experiencing vomiting, diarrhea, sore throat, earache, hoarseness, headache, altered mental status, syncope, recent seizures. abdominal pain, hematemesis, or hematochezia. *Id.* An examination of Plaintiff's lungs revealed "diffuse wheezes and rhonchi," but the results of an examination, including a cardiovascular examination, were unremarkable. (Tr. 315-16). X-rays of Plaintiff's chest "did not

show any infiltrates, pulmonary or vascular congestion, pleural effusion or pneumothorax." (Tr. 316). Plaintiff was diagnosed with bronchitis and given an aerosol treatment. Plaintiff "had good resolution of his symptoms" following this treatment and was discharged home. *Id.*

On June 20, 2003, Plaintiff reported to the emergency room complaining of chest pain. (Tr. 308-09). The doctor reported that "there is no pattern of exertional chest discomfort, nausea, sweats, or exertional indigestion, or heartburn." (Tr. 308). The doctor further noted that "there has been no antecedent respiratory infection or flu-like symptoms. No nausea, vomiting, or diarrhea. No fever, chills, sweats, no hoarseness, or stridor. All other symptoms were reviewed and were negative." *Id.* Plaintiff participated in an EKG examination, the results of which were "normal." (Tr. 312). Plaintiff reported that "he was arguing with his daughter just prior to coming to the Emergency Department." (Tr. 308). Plaintiff was diagnosed with "chest pain of noncardiac etiology, possibly secondary to stress," and discharged home. (Tr. 309).

On August 6, 2003, Plaintiff reported to the emergency room complaining of right knee pain. (Tr. 392). Plaintiff reported that he injured his knee while playing football. *Id.* X-rays of Plaintiff's knee revealed no evidence of fracture or dislocation. (Tr. 395). Plaintiff was diagnosed with effusion, in response to which doctors aspirated fluid from Plaintiff's knee. (Tr. 385). Plaintiff reported that he "felt better" following this procedure. *Id.* While at the hospital, Plaintiff also participated in an EKG examination, the results of which were "within normal limits" with "normal sinus rhythm." (Tr. 396).

On September 3, 2003, Plaintiff was transported to the emergency room for treatment of a reported seizure. (Tr. 375). Plaintiff was allegedly "found lying on the floor," after which an ambulance was summoned. When the paramedics arrived, Plaintiff was "awake and alert." *Id.* The

results of a physical examination were unremarkable. (Tr. 375-76). Plaintiff was discharged home "in stable condition." (Tr. 376).

X-rays of Plaintiff's chest, taken September 4, 2003, revealed "no abnormality." (Tr. 382).

At the administrative hearing, Plaintiff testified that he experiences "constant" pain associated with his "breathing problems." (Tr. 468). Specifically, Plaintiff reported that "it feels like a knife twisting on the inside [of his lungs]. . .from the [time] I get up until the time I go to sleep." Plaintiff reported that he experiences seizures "maybe once every three - every two weeks or something like that, whenever I get stressed out." *Id.* Plaintiff testified that on a typical day he sits watching television. (Tr. 469). He also reported that he drives, visits relatives, and goes fishing. (Tr. 469-70).

With respect to his alleged breathing problems, Plaintiff testified that his inhalers "don't work." (Tr. 467, 472). As for Plaintiff's ability to drive in light of the seizures which he allegedly suffers, the ALJ noted that "it's unusual for someone to have so many grand mal seizures and not have their driver's license suspended." (Tr. 470). In response, Plaintiff asserted that his doctor "wanted to have them suspended," but declined because Plaintiff's wife was unable to drive. (Tr. 470-71).

9

## ANALYSIS OF THE ALJ'S DECISION

### A. Applicable Standards

The social security regulations articulate a five-step sequential process for evaluating disability. *See* 20 C.F.R. §§ 404.1520(a-f), 416.920(a-f).[3] If the Commissioner can make a dispositive finding at any point in the review, no further finding is required. *See* 20 C.F.R. §§ 404.1420(a), 416.920(a). The regulations also provide that if a claimant suffers from a nonexertional impairment as well as an exertional impairment, both are considered in determining his residual functional capacity. *See* 20 C.F.R. §§ 404.1545, 416.945.

### B. The ALJ's Decision

The ALJ determined that Plaintiff suffers from the following severe impairments: (1) chronic obstructive pulmonary disease, (2) sleep apnea, (3) seizure disorder, and (4) right knee problem. (Tr. 23). The ALJ concluded that these impairments, whether considered alone or in combination, failed to satisfy the requirements of any impairment identified in the Listing of Impairments detailed in 20 C.F.R., Part 404, Subpart P, Appendix 1. *Id.* The ALJ determined that

---

[3] 1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. 404.1520(b));

2. An individual who does not have a "severe impairment" will not be found "disabled" (20 C.F.R. 404.1520(c));

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement and which "meets or equals" a listed impairment in Appendix 1 of Subpart P of Regulations No. 4, a finding of "disabled" will be made without consideration of vocational factors (20 C.F.R. 404.1520(d));

4. If an individual is capable of performing work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. 404.1520(e));

5. If an individual's impairment is so severe as to preclude the performance of past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. 404.1520(f)).

while Plaintiff was unable to perform his past relevant work, there existed a significant number of jobs which he could perform despite his limitations. (Tr. 26-27). Accordingly, the ALJ concluded that Plaintiff was not disabled as defined by the Social Security Act.

### 1. The ALJ's Decision is Supported by Substantial Evidence

The burden of establishing the right to benefits rests squarely on Plaintiff's shoulders, and he can satisfy his burden by demonstrating that his impairments are so severe that he is unable to perform his previous work, and cannot, considering his age, education, and work experience, perform any other substantial gainful employment existing in significant numbers in the national economy. *See* 42 U.S.C. § 423(d)(2)(A); *Cohen*, 964 F.2d at 528.

As noted above, the Commissioner has established a five-step disability determination procedure. While the burden of proof shifts to the Commissioner at step five, Plaintiff bears the burden of proof through step four of the procedure, the point at which his residual functioning capacity (RFC) is determined. *See Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997) (ALJ determines RFC at step four, at which point claimant bears the burden of proof).

With respect to Plaintiff's residual functional capacity, the ALJ determined that Plaintiff retained the capacity to perform "sedentary work, or work which is generally performed while sitting and never requires lifting in excess of ten pounds" subject to the following restrictions: (1) he must be able to sit at least 6 hours of an 8-hour workday, and walk and/or stand 2 hours of an 8-hour workday; (2) he cannot perform any overhead pushing or pulling; (3) he cannot perform any repetitive bending, twisting, or turning; (4) he cannot perform any crawling, squatting, kneeling, or

climbing; (5) he cannot drive; (6) he must be able to work in a controlled environment relatively free of dust, fumes, or smoke; (7) he cannot work at heights or around unprotected moving machinery; and (8) the job must be low stress as Plaintiff stated that stress causes his seizures. (Tr. 26). After reviewing the relevant medical evidence, the Court concludes that the ALJ's determination as to Plaintiff's RFC is supported by substantial evidence.

The ALJ determined that Plaintiff was unable to perform his past relevant work, at which point the burden of proof shifted to the Commissioner to establish by substantial evidence that a significant number of jobs exist in the national economy which Plaintiff could perform, his limitations notwithstanding. *See Richardson*, 735 F.2d at 964.

While the ALJ is not required to question a vocational expert on this issue, "a finding supported by substantial evidence that a claimant has the vocational qualifications to perform specific jobs" is needed to meet the burden. *O'Banner v. Sec'y of Health and Human Services*, 587 F.2d 321, 323 (6th Cir. 1978) (emphasis added). This standard requires more than mere intuition or conjecture by the ALJ that the claimant can perform specific jobs in the national economy. *See Richardson*, 735 F.2d at 964. Accordingly, ALJs routinely question vocational experts in an attempt to determine whether there exist a significant number of jobs which a particular claimant can perform, his limitations notwithstanding. Such was the case here, as the ALJ questioned vocational expert Donald Hecker.

The vocational expert testified that there existed approximately 19,000 jobs which an individual with Plaintiff's RFC could perform, such limitations notwithstanding. (Tr. 474-77). This represents a significant number of jobs. *See Born v. Sec'y of Health and Human Services*, 923 F.2d 1168, 1174 (6th Cir. 1990) (a finding that 2,500 jobs existed which the claimant could perform

constituted a significant number); *Hall v. Bowen*, 837 F.2d 272, 274 (6th Cir. 1988) (the existence of 1,800 jobs which the claimant could perform satisfied the significance threshold).

      a. Plaintiff does not Suffer from a Listed Impairment

The Listing of Impairments, detailed in 20 C.F.R., Part 404, Subpart P, Appendix 1, identifies various impairments which, if present to the severity detailed therein, result in a finding that the claimant is disabled. Plaintiff asserts that his impairments satisfy the requirements of several different impairments identified in the Listing of Impairments. Specifically, Plaintiff asserts that his impairments satisfy the requirements of Listings 3.00G, 3.09, 11.02 and 12.02

      1. Listing 3.00G

This particular section of the Listing addresses claimants suffering from "chronic cor pulmonale and pulmonary vascular disease." According to this particular portion of the Listing:

> The establishment of an impairment attributable to irreversible cor pulmonale secondary to chronic pulmonary hypertension requires documentation by signs and laboratory findings of right ventricular overload or failure (e.g., an early diastolic right-sided gallop on auscultation, neck vein distension, hepatomegaly, peripheral edema, right ventricular outflow tract enlargement on x-ray or other appropriate imaging techniques, right ventricular hypertrophy on ECG, and increased pulmonary artery pressure measured by right heart catheterization available from treating sources).

There is absolutely no evidence in the record supporting Plaintiff's assertion that his impairments satisfy (or medically equal) the requirements of this Listing. To the contrary, the record reveals that Plaintiff suffers from COPD which responds favorably to conservative treatment such

13

as the use of inhalers. Substantial evidence supports the ALJ's decision that Plaintiff's impairments neither satisfy, nor medically equal, this Listing.

    2. Listing 3.09

This particular section of the Listing addresses claimants suffering from "cor pulmonale secondary to chronic pulmonary vascular hypertension." To satisfy the requirements of this Listing, there must exist "clinical evidence of cor pulmonare (documented according to 3.00G)" with:

    A. Mean pulmonary artery pressure greater than 40 mm Hg;

       or

    B. Arterial hypoxemia. Evaluate under the criteria in 3.02C2[4];

       or

    C. Evaluate under the applicable criteria in 4.02[5].

There exists no evidence in the record that Plaintiff satisfies (or medically equals) the requirements of this Listing. As detailed above, Plaintiff does not suffer from chronic heart failure and his COPD, while a severe impairment, is not disabling in severity. Substantial evidence supports the ALJ's decision that Plaintiff's impairments neither satisfy, nor medically equal, this Listing.

---

[4] Section 3.02C2 addresses "chronic impairment of gas exchange due to clinically documented pulmonary disease" through measurement of "arterial blood gas values." This section articulates the specific blood gas values necessary to satisfy this particular provision. There is no evidence that Plaintiff's arterial blood gas values satisfy the requirements of this section.

[5] Section 4.02 addresses claimants who have suffered "chronic heart failure while on a regimen of prescribed treatment." There is no evidence that Plaintiff has experienced chronic heart failure.

3.  Listing 11.02

This particular section of the Listing of Impairments provides as follows:

11.02   Epilepsy - convulsive epilepsy (grand mal or psychomotor), documented by detailed description of a typical seizure pattern, including all associated phenomena; occurring more frequently than once a month in spite of at least 3 months of prescribed treatment. With

>    A.   Daytime episodes (loss of consciousness and convulsive seizures) or
>
>    B.   Nocturnal episodes manifesting residuals which interfere significantly with activity during the day.

While Plaintiff has a history of seizure disorder, as the ALJ correctly concluded Plaintiff's description of the frequency and magnitude of his seizures is not credible.

On January 21, 2001, Plaintiff reported that he had not suffered a seizure during the previous year and was no longer taking his seizure medication. (Tr. 259). On February 25, 2001, Plaintiff again reported that he was not taking his seizure medication. (Tr. 255). On June 11, 2001, Plaintiff reported that his seizure disorder was controlled with medication. (Tr. 238). On September 7, 2001, Plaintiff reported that his seizures were controlled with medication and that he had not suffered a seizure in the past year. (Tr. 142). On May 23, 2002, Plaintiff reported that he experienced only 2-3 seizures each year and had discontinued taking his seizure medication. (Tr. 201). Plaintiff allegedly suffered seizures on three occasions in 2003, but these were never verified and Plaintiff was simply discharged from the hospital on each occasion in stable condition with instructions to take his seizure medication. (Tr. 327-28, 334-35, 375-76).

15

Plaintiff asserts that his subjective allegations "are corroborated by his wife who said he was having seizures as often as once a day." (Plaintiff's Brief at 10). Plaintiff is correct that on May 13, 2002, Plaintiff's wife reported that Plaintiff suffered 1-2 seizures daily, the severity of which caused him to thrash, jerk, and lose consciousness. (Tr. 91-92). It must be remembered, however, that only ten days after his wife completed this questionnaire, Plaintiff reported that he only experienced 2-3 seizures *each year*. (Tr. 201). The Court further notes that Plaintiff also completed a seizure questionnaire on May 13, 2002, the responses to which were in direct contradiction to the information Plaintiff provided to his care providers on May 23, 2002. (Tr. 93-94).

In sum, there exists substantial evidence supporting the ALJ's decision that Plaintiff's impairments neither satisfy, nor medically equal, this particular Listing.

4. Listing 12.02

Plaintiff also asserts that his impairments satisfy the requirements of Section 12.02 of the Listing of Impairments. This particular Listing addresses "psychological or behavioral abnormalities associated with a dysfunction of the brain." The record contains no evidence that Plaintiff suffers from any such impairment or that his condition satisfies the various requirements detailed in this Listing. Substantial evidence supports the ALJ's decision that Plaintiff's impairments neither satisfy, nor medically equal, this Listing.

b. The ALJ Properly Discounted Plaintiff's Subjective Allegations

The ALJ concluded that Plaintiff "allegations regarding his limitations are not totally credible." (Tr. 28). Plaintiff argues that the ALJ improperly discounted his subjective allegations of pain and limitation.

As the Sixth Circuit has long recognized, "pain alone, if the result of a medical impairment, *may* be severe enough to constitute disability." *King v. Heckler*, 742 F.2d 968, 974 (6th Cir. 1984) (emphasis added). As the relevant Social Security regulations make clear, however, a claimant's "statements about [her] pain or other symptoms will not alone establish that [she is] disabled." 20 C.F.R. § 404.1529(a); *see also*, *Walters v. Commissioner of Social Security*, 127 F.3d 525, 531 (6th Cir. 1997) (quoting 20 C.F.R. § 404.1529(a)). Instead, as the Sixth Circuit has established, a claimant's assertions of disabling pain and limitation are evaluated pursuant to the following standard:

> First, we examine whether there is objective medical evidence of an underlying medical condition. If there is, we then examine: (1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain.

*Walters*, 127 F.3d at 531 (citations omitted). This standard is often referred to as the *Duncan* standard. *See Workman v. Commissioner of Social Security*, 2004 WL 1745782 at *6 (6th Cir., July 29, 2004).

Accordingly, as the Sixth Circuit has repeatedly held, "subjective complaints may support a finding of disability only where objective medical evidence confirms the severity of the alleged symptoms." *Id.* (citing *Blankenship v. Bowen*, 874 F.2d 1116, 1123 (6th Cir. 1989)).

17

However, where the objective medical evidence fails to confirm the severity of a claimant's subjective allegations, the ALJ "has the power and discretion to weigh all of the evidence and to resolve the significant conflicts in the administrative record." *Id.* (citing *Walters*, 127 F.3d at 531).

In this respect, it is recognized that the ALJ's credibility assessment "must be accorded great weight and deference." *Id.* (citing *Walters*, 127 F.3d at 531); *see also*, *Heston v. Commissioner of Social Security*, 245 F.3d 528, 536 (6th Cir. 2001) ("[i]t is for the [Commissioner] and his examiner, as the fact-finders, to pass upon the credibility of the witnesses and weigh and evaluate their testimony") (citations omitted). It is not for this Court to reevaluate such evidence anew, and so long as the ALJ's determination is supported by substantial evidence, it must stand. The ALJ found Plaintiff's subjective allegations to not be fully credible, a finding that should not be lightly disregarded. *See Varley v. Sec'y of Health and Human Services*, 820 F.2d 777, 780 (6th Cir. 1987).

As discussed above, Plaintiff has greatly exaggerated the frequency and severity of his seizure disorder. The record is also devoid of evidence supporting Plaintiff's claim that he is disabled by leg pain. As for Plaintiff's COPD, the record reveals that while such constitutes a severe impairment, it responds favorably to conservative treatment such as inhalers. This conclusion is supported by Plaintiff's reported activities which include regular fishing trips, performing yard work, and playing football. In sum, there exists substantial evidence to support the ALJ's credibility determination.

## **CONCLUSION**

For the reasons articulated herein, the undersigned concludes that the ALJ's decision adheres to the proper legal standards and is supported by substantial evidence. Accordingly, it is recommended that the Commissioner's decision be **affirmed**.

OBJECTIONS to this report and recommendation must be filed with the Clerk of Court within ten (10) days of the date of service of this notice. 28 U.S.C. § 636(b)(1)(C). Failure to file objections within the specified time waives the right to appeal the District Court's order. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).


Date: July 13, 2005                                     /s/ Ellen S. Carmody
                                                        ELLEN S. CARMODY
                                                        United States Magistrate Judge